## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| CANDICE BECHERER,            ) | |
| ) | |
|          **Plaintiff,**        ) | |
| ) | |
|      **vs.**              ) | **Case No. 4:12CV2356 ACL** |
| ) | |
| CAROLYN W. COLVIN,       ) | |
| **Acting Commissioner of Social Security,**   ) | |
| ) | |
|        **Defendant.**       ) | |

### MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Candice Becherer for Supplemental Security Income under Title XVI of the Social Security Act.   This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.   See 28 U.S.C. § 636(c).   Plaintiff filed a Brief in support of the Complaint.   (Doc. No. 12) Defendant filed a Brief in Support of the Answer.   (Doc. No. 17)

### Procedural History

On May 20, 2010, Plaintiff filed an application for Supplemental Security Income, claiming that she became unable to work due to her disabling condition on March 1, 2007.   (Tr. 114-17)   This claim was denied initially and, following an administrative hearing, Plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated July 26, 2011.   (Tr. 64, 19-36)   Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on October 24, 2012.   (Tr. 1-6)   Thus, the decision of the ALJ stands as the final decision of the Commissioner.

See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.     ALJ Hearing**

Plaintiff's administrative hearing was held on June 6, 2011.   Plaintiff was present and was represented by counsel.   Also present was vocational expert Herman Litt.   (Tr. 42)

In an opening statement, Plaintiff's attorney argued that Plaintiff is limited to less than sedentary work due to a combination of physical and mental impairments.   (Tr. 45-46)

Plaintiff's attorney examined Plaintiff, who testified that she had not worked since 2006.

Plaintiff testified that she suffers from bipolar disorder,[1] which causes her to feel depressed and "mad" all the time.   Plaintiff stated that she has difficulty with sleep, including a desire to sleep all day occasionally, and an inability to stay asleep at night.   Plaintiff testified that she has problems with concentration due to bipolar disorder.   (Tr. 47)

Plaintiff stated that her bipolar disorder has affected her relationships with her family and friends.   Plaintiff testified that she has a hard time being around people and frequently argues with family members.   Plaintiff stated that she does not leave the house by herself often.

Plaintiff testified that she spends a typical day at her home.   (Tr. 48)   Plaintiff stated that her bipolar disorder symptoms have affected her ability to do household activities.   Plaintiff explained that she is frequently distracted while doing household chores, which makes it difficult to complete tasks.   Plaintiff stated that she stays in her room all day approximately two days a week.

---

[1]An affective disorder characterized by the occurrence of alternating manic, hypomanic or mixed episodes and with major depressive episodes.   See Stedman's Medical Dictionary, 1729 (28th Ed. 2006).

2

Plaintiff testified that she was receiving treatment for bipolar disorder at the time of the hearing. Plaintiff stated that she was taking medications, although she did not know whether the medications were prescribed specifically for bipolar disorder. Plaintiff testified that her medications caused her to feel "tired all the time." (Tr. 49)

Plaintiff testified that she experiences a constant, sharp pain in her upper and lower back. Plaintiff stated that her back pain affects her sleep, because she is unable to get comfortable. Plaintiff testified that she sleeps about four hours a night.

Plaintiff stated that she usually wakes up at approximately 4:00 a.m. and gets up and tries to move around. Plaintiff testified that she then sits down until it is time to get her children ready for school. (Tr. 50) Plaintiff stated that she has two children, who are aged sixteen and eleven. Plaintiff testified that her children are able to shower and dress independently.

Plaintiff stated that she has difficulty standing due to her back pain. Plaintiff testified that she is able to stand for about ten minutes before she has to sit down for ten to fifteen minutes to rest before standing again. Plaintiff stated that she is able to sit for ten to fifteen minutes before she has to get up or walk around due to pain. (Tr. 51) Plaintiff testified that she elevates her feet at heart level every time she sits pursuant to her doctor's orders. Plaintiff stated that she elevates her feet for ten to fifteen minutes at a time and a total of three to four hours a day. Plaintiff testified that she is able to walk for ten minutes at a time before she has to sit down due to pain. (Tr. 52) Plaintiff testified that she would be able to comfortably lift five pounds every fifteen minutes during an eight-hour workday without experiencing back pain.

Plaintiff stated that she suffers from pain in her feet, which affects her ability to walk and perform household chores. (Tr. 53) Plaintiff testified that she also experiences fatigue, which

affects her ability to perform tasks.

Plaintiff testified that she would be unable to perform a full-time sit-down job due to her inability to concentrate and her need to get up and move around frequently to relieve her back and leg pain. (Tr. 54)

The ALJ then examined the vocational expert, Mr. Litt. The ALJ asked Mr. Litt to assume a hypothetical claimant with Plaintiff's background and the following limitations: light work; only occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing; only simple, routine, repetitive tasks not performed in a fast-paced production environment involving only simple work-related decisions and few workplace changes; and only occasional interaction with supervisors, co-workers, and the general public. (Tr. 56-57) Mr. Litt testified that the individual would be able to perform the following positions: laundry press operator (200,000 positions nationally; 1,500 in Missouri); office cleaner (250,000 positions nationally; 1,400 in Missouri); and mail clerk (290,000 positions nationally, 1,200 in Missouri). Mr. Litt stated that no more than two absences per month are customarily permitted by employers, and rest breaks typically consist of a fifteen-minute break in the morning and afternoon, and a thirty-minute to one-hour lunch break. Mr. Litt testified that employees are generally expected to be on task a minimum of eighty percent of the time. (Tr. 57)

Plaintiff's attorney asked Mr. Litt to assume a hypothetical claimant with the following limitations: occasionally able to maintain attention and concentration for extended periods; occasionally able to work within a schedule and maintain regular attendance; occasionally able to complete a normal workday or workweek without interruptions from psychologically-based symptoms; occasionally able to perform at a consistent pace with a standard number and length of

4

rest periods; markedly limited in the ability to accept instructions or respond appropriately to criticism; and occasionally able to get along with co-workers or peers without distracting them. (Tr. 58-59)   Mr. Litt testified that these limitations would not be tolerated in a competitive work environment.   (Tr. 59)

B.      **Relevant Medical Records**

Plaintiff presented to Pathways Community Behavioral Healthcare ("Pathways") on December 24, 2008, for an annual mental assessment.   Plaintiff complained of anxiety, depression, and problems with impulse control.   (Tr. 491)   Upon mental status examination, Plaintiff appeared to be somewhat depressed, but her mood, affect, impulse control, thought content, attention/concentration, judgment, and insight were within normal limits.   (Tr. 492) Kathilene S. Ball, MA, diagnosed Plaintiff with bipolar affective disorder and panic disorder,[2] with a GAF score[3] of 45.[4]   (Tr. 498-99)   Plaintiff was prescribed Xanax,[5] Geodon,[6] Trileptal,[7] and Celexa.[8]   (Tr. 501)

Plaintiff saw Gregory Maynard, D.O. on March 9, 2009, for a cardiac evaluation.   Plaintiff

---

[2]Recurrent panic attacks that occur unpredictably.   Stedman's at 570.

[3]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."   Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[4]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   DSM-IV at 32.

[5]Xanax is indicated for the treatment of anxiety and panic disorders.   See WebMD, http://www.webmd.com/drugs (last visited June 19, 2014).

[6]Geodon is indicated for the treatment of schizophrenia and bipolar mania.   See Physician's Desk Reference (PDR), 2521 (63rd Ed. 2009).

[7]Trileptal is indicated for the treatment of seizure disorders.   See WebMD, http://www.webmd.com/drugs (last visited June 19, 2014).

[8]Celexa is an antidepressant drug indicated for the treatment of depression.   See PDR at 1160.

complained of chest discomfort, fatigue, and periodic shortness of breath, but reported no "new or unusual" musculoskeletal symptoms. (Tr. 305-06) Upon examination, Plaintiff's extremities were normal. Plaintiff was diagnosed with lethargy and elevated blood pressure. (Tr. 306)

Plaintiff presented to Dr. Maynard on June 4, 2009, complaining of difficulty with irritability. Plaintiff reported stress dealing with her children and reported fighting verbally with her husband. Plaintiff also complained of left lower extremity numbness to the anterior thigh for approximately one year, with no weakness. (Tr. 317) Upon examination, Plaintiff was alert and cooperative and in no distress. Plaintiff's extremities were normal. Dr. Maynard diagnosed Plaintiff with mood disorder,[9] paresthesia of the left leg, and cough. He prescribed Cymbalta[10] for Plaintiff's mood disorder. (Tr. 318-19)

Plaintiff presented to Dr. Maynard for follow-up on July 7, 2009, at which time she reported that she had stopped medications due to nausea associated with Cymbalta. Dr. Maynard prescribed Pristiq[11] for Plaintiff's mood disorder. (Tr. 322-23)

Plaintiff presented to Kimberely Ingram, LPC, for counseling on September 14, 2009. Ms. Ingram noted that Plaintiff walked with a "smooth gait."[12] Plaintiff's mood was depressed and her affect was congruent with her mood as evidenced by crying spells, slowed speech, and reported grieving over the death of a friend. Plaintiff also reported only sleeping three to four hours a night, having a reduced appetite, poor concentration, and poor memory. Ms. Ingram indicated that Plaintiff's treatment would focus on anxiety-management skills, grief therapy, and

---

[9]Mood disorders are a group of mental disorders involving a disturbance of mood, accompanied by either a full or partial manic or depressive syndrome that is not due to any other mental disorder. See Stedman's at 569.

[10]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 1801.

[11]Pristiq is indicated for the treatment of major depressive disorder. See PDR at 3247.

[12]Ms. Ingram continued to note plaintiff's "smooth gait" on all subsequent visits.

desensitization for phobia.   (Tr. 481)   On September 23, 2009, Plaintiff reported feeling

"grouchy," due to having pneumonia.   Ms. Ingram found Plaintiff's concentration was adequate

and her memory was intact.   (Tr. 480)   On September 30, Plaintiff's mood and affect were

depressed and her sleep pattern was poor.   Plaintiff's concentration was adequate and her memory

was intact.   (Tr. 478)   On October 12, 2009, Plaintiff's mood was anxious.   Plaintiff's

concentration was adequate and her memory was intact.   (Tr. 476)   On October 21, 2009,

Plaintiff's mood was depressed, and she reported that she had isolated herself in her room all week.

Plaintiff's concentration was adequate and her memory was intact.   Ms. Ingram recommended

stress relief exercises.   (Tr. 473)   On November 2, 2009, Ms. Ingram noted that Plaintiff's mood

was improved from the last session.   (Tr. 471)   On November 11, 2009, Plaintiff's mood was

pleasant despite reporting significant stress the prior week due to going three days without

medication.   Plaintiff was making progress toward her treatment goals, as she drove to Houston

with "manageable anxiety."   (Tr. 469)

On November 17, 2009, Plaintiff presented to Dr. Maynard with complaints of back pain

that began two weeks prior.   Dr. Maynard noted that Plaintiff's back was tender to palpation, but

there was no radiation to the lower extremities.   Dr. Maynard prescribed Cataflam,[13] Flexeril,[14]

and Ultram[15] for pain.   (Tr. 247)

Plaintiff saw Ms. Ingram on December 2, 2009, at which time her mood was depressed.

Plaintiff's concentration was adequate and her memory was intact.   (Tr. 467)

---

[13]Cataflam is a nonsteroidal anti-inflammatory drug indicated for the treatment of pain and
inflammation. See WebMD, http://www.webmd.com/drugs (last visited June 19, 2014).
[14]Flexeril is indicated for the treatment of muscle spasms.   See WebMD,
http://www.webmd.com/drugs (last visited June 19, 2014).
[15]Ultram is indicated for the management of moderate to moderately severe chronic pain in adults
who require around-the-clock treatment of their pain for an extended period.   See PDR at 2429.

Plaintiff saw Ms. Ball for her annual mental assessment on December 2, 2009. Plaintiff complained of depression, panic, phobias of driving and being home alone, and anxiety. (Tr. 454) Ms. Ball indicated that Plaintiff's reliability was "questionable," as she "has a history of manipulating and not telling the truth so that the situation can benefit her." (Tr. 453) Upon mental status examination, Plaintiff's mood was irritable and her affect was depressed. (Tr. 455) Plaintiff's memory, concentration, judgment, and thought content were within normal limits. Her insight was fair. (Tr. 456) Plaintiff was diagnosed with bipolar affective disorder, and panic disorder, and was given a GAF score of 45. (Tr. 461-62)

Plaintiff presented to Bradley D. Jones, D.O. on December 8, 2009, at which time she reported she had gone to the emergency room earlier that day because she had passed a kidney stone. Upon examination, Dr. Jones noted that Plaintiff had normal musculoskeletal range of motion. (Tr. 252)

Plaintiff saw Ms. Ingram on December 16, 2009, at which time her mood was improved and her affect was congruent with her mood, as evidenced by more smiling, brighter facial expressions, and good interactions. Plaintiff's concentration was good and her memory was intact. Plaintiff was making good progress on her phobia of driving and drove herself to the appointment. (Tr. 450) On December 22, 2009, Plaintiff's mood and affect were anxious. Plaintiff reported feeling stressed about family gatherings over the holidays. Plaintiff's concentration was adequate and her memory was intact. (Tr. 448) On January 15, 2010, Plaintiff was anxious due to her boyfriend's brother staying with them and causing more conflict and more work for Plaintiff. (Tr. 446) Plaintiff reported irritability due to her boyfriend's brother on February 12, 2010. (Tr. 444)

Plaintiff presented to Dr. Maynard on February 4, 2010, with complaints of neck stiffness and pain. (Tr. 269) Upon examination, Plaintiff's neck was tender to palpation of the paraspinal musculature on the left side and Plaintiff's back was tender to palpation of the lumbar spine. Dr. Maynard diagnosed Plaintiff with neck sprain and strain; and low back pain. He prescribed Hydrocodone,[16] Baclofen,[17] and Methylprednisolone,[18] and encouraged Plaintiff to get x-rays of her back. (Tr. 270) Plaintiff returned for follow-up on February 15, 2010, at which time it was noted x-rays revealed degenerative joint disease.[19] (Tr. 280) Upon examination, Dr. Maynard noted tenderness to palpation of the lumbar spine and positive straight leg raise on the left. Dr. Maynard diagnosed Plaintiff with back pain with radiation; lumbar degenerative joint disease. He prescribed Gabapentin[20] and back exercises. (Tr. 281)

Plaintiff saw Ms. Ingram on February 26, 2010, at which time her mood was depressed. Plaintiff reported conflict with her boyfriend. Plaintiff's concentration was adequate and her memory was intact. (Tr. 441) On March 5, 2010, Plaintiff reported decreased conflict with her boyfriend and her mood was improved. Ms. Ingram noted that Plaintiff had seen a psychiatrist, Dr. Eyman, who suspected Plaintiff's bipolar diagnosis was incorrect since the Plaintiff "does not experience the typical manic episodes"; consequently Dr. Eyman decreased Plaintiff's bipolar

---

[16]Hydrocodone is indicated for moderate to moderately severe pain. See PDR at 3144.
[17]Baclofen is indicated for the treatment of muscle spasms. See WebMD, http://www.webmd.com/drugs (last visited June 19, 2014).
[18]Methylprednisolone is a corticosteroid indicated for the treatment of arthritis. See WebMD, http://www.webmd.com/drugs (last visited June 19, 2014).
[19]Degenerative joint disease, or osteoarthritis, is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. See Stedman's at 1388.
[20]Gabapentin is indicated for the treatment of nerve pain. See WebMD, http://www.webmd.com/drugs (last visited June 19, 2014).

medication dosage by half. (Tr. 439) On March 12, 2010, Plaintiff was depressed and stressed. Plaintiff's concentration was adequate and her memory was intact. (Tr. 437) On March 26, 2010, Plaintiff's mood was "improved and pleasant." (Tr. 435)

Plaintiff saw Dr. Maynard for follow-up on March 25, 2010, at which time she reported her back and left lower extremity pain was unchanged. Plaintiff also reported fatigue and generalized aches. (Tr. 289) Upon examination, Plaintiff's neck was tender to palpation, her back was tender to palpation of the lumbar spine, and her straight leg raise test was positive on the left. Dr. Maynard recommended an MRI of the lumbar spine. He prescribed Hydrocodone and Baclofen. (Tr. 291)

On March 26, 2010, Ms. Ingram described Plaintiff's mood as "improved and pleasant." (Tr. 435) Plaintiff's mood was also "pleasant" on April 16, 2010. (Tr. 433) On April 23, 2010, Plaintiff's mood was anxious. Plaintiff's concentration was "fleeting," and her memory was intact. (Tr. 431) On April 30, 2010, Plaintiff's mood was improved. (Tr. 428) Plaintiff's mood was "less anxious" than it had been the past month on May 14, 2010. (Tr. 426) Plaintiff's mood was depressed on May 28, 2010. Plaintiff reported that her mood had been negatively impacted by being physically ill the past month. (Tr. 423)

Plaintiff presented to Dr. Maynard on June 3, 2010, with complaints of ankle and foot pain with ambulation. (Tr. 372) Dr. Maynard noted tenderness to palpation of the plantar surface of the foot. He diagnosed Plaintiff with plantar fasciitis.[21] (Tr. 373)

Plaintiff saw Ms. Ingram on June 11, 2010, at which time Plaintiff's mood was "irritated." (Tr. 421) Plaintiff's concentration was adequate and her memory was intact. Id. On June 25,

_____

[21]Inflammation of the plantar fascia, most usually non-infectious, and often caused by an overuse mechanism; elicits foot and heel pain. Stedman's at 706.

2010, Plaintiff's mood was "happy" due to receiving good news about her divorce.   (Tr. 419)

Plaintiff reported that she was able to drive with little to no anxiety.   Id.   On July 2, 2010,

Plaintiff's mood was anxious and angry.   Plaintiff reported only sleeping two hours the previous

night.   Plaintiff's concentration was poor, her thought process was fleeting, and her memory was

intact.   Ms. Ingram stated that Plaintiff's depression was improving overall.   (Tr. 417)   On July

16, 2010, Plaintiff's mood was anxious.   Her concentration was fleeting and her memory was

intact.   Plaintiff reported constant conflict with family members.   (Tr. 414)   On July 23, 2010,

Plaintiff's mood was "pleasant."   (Tr. 412)   Ms. Ingram stated that Plaintiff's mood was more

stable that week and that she had not experienced much depression lately.   Id.

Stanley Hutson, Ph.D., a non-examining state agency psychologist, completed a

Psychiatric Review Technique on July 15, 2010.   Dr. Hutson assessed anxiety (Tr. 331 and 335)

and depression (Tr. 331, 334), but found there was insufficient evidence to evaluate Plaintiff's

current functioning, adding that Plaintiff did not return requested forms.   (Tr. 331-41)

Plaintiff saw Dr. Maynard for follow-up on July 21, 2010.   Plaintiff reported continued

bilateral foot and ankle pain with ambulation/weight bearing.   Plaintiff indicated that her pain

improves once she walks around.   (Tr. 364)   Upon examination, Dr. Maynard noted tenderness

to palpation of the plantar surface of the foot, and tenderness to palpation of the lumbosacral spine.

(Tr. 365)   Plaintiff was diagnosed with back pain and foot pain.   Dr. Maynard prescribed

Hydrocodone and a lumbar MRI, and referred Plaintiff to a podiatrist.   (Tr. 366)

Plaintiff underwent an MRI of the lumbar spine on August 4, 2010, which revealed mild

degenerative changes in the lower lumbar spine.   (Tr. 345)

Plaintiff saw Ms. Ingram on August 6, 2010, at which time her mood was "improved."

(Tr. 410)   On August 27, Ms. Ingram described Plaintiff's mood as "pleasant."   (Tr. 408)   On September 17, 2010, Plaintiff's mood was depressed and anxious.   Plaintiff reported that she had four extra people living with her.   Plaintiff indicated that her depression was not as severe as it was in the past.   Ms. Ingram found that Plaintiff's concentration was poor but her memory was intact.   (Tr. 405)   On October 1, 2010, Plaintiff was anxious and irritable due to conflict between her boyfriend and her brother.   Plaintiff's concentration was poor, her thought process was fleeting, and her memory was intact.   (Tr. 403)   On October 8, 2010, Plaintiff's anxiety was high due to family conflict, Department of Family Services ("DFS") involvement, and the possibility of her son being hospitalized against his will.   (Tr. 401)   On October 15, 2010, Plaintiff's mood was improved.   Plaintiff reported less anxiety the past four days.   (Tr. 399)   Plaintiff's mood continued to be improved on October 25, 2010.   Plaintiff's concentration was poor due to racing thoughts; her thought process was fleeting; and her memory was intact.   Plaintiff reported that she had been using coping skills of exercise through cutting wood, and that she felt happier and more relaxed the past few days.   (Tr. 397)   On November 12, 2010, Plaintiff reported experiencing anxiety due to new stressors regarding her boyfriend and son.   Plaintiff's concentration was poor, her thought process was fleeting, and her memory was intact.   (Tr. 394)   Plaintiff reported stress due to the holidays on December 3, 2010.   Plaintiff's concentration was poor, her mind was racing, her thought process was fleeting, and her memory was intact.   (Tr. 392)   On December 17, 2010, Ms. Ingram noted that Plaintiff's mood fluctuated between sadness, irritability, and pleasantness.   Plaintiff reported that she was socializing every Friday night by attending auctions. Plaintiff's concentration was adequate, her thought process was fluid, and her memory was intact. (Tr. 390)   On December 28, 2010, Plaintiff reported a depressed mood due to family conflict.

Plaintiff's concentration was adequate and her memory was intact.   (Tr. 388)   Plaintiff's mood

was irritable and depressed on January 17, 2011.   Plaintiff reported conflict in her family.   (Tr.

517)   Plaintiff's mood continued to be irritable on January 25, 2011.   Plaintiff reported that her

medications were helping her mood and controlling her panic attacks.   (Tr. 516)   On February 4,

2011, Plaintiff reported that her mood had been depressed and stressed.   Plaintiff's concentration

was adequate and her memory was intact.   (Tr. 515)

Plaintiff saw Ms. Ball for her annual assessment at Pathways on January 14, 2011.

Plaintiff reported moderate depression, and moderate panic.   Ms. Ball noted that Plaintiff did not

appear to have a lot of problems with panic symptoms unless she was having family problems.

Plaintiff reported moderate to mild anxiety symptoms.   Ms. Ball indicated that Plaintiff had made

some progress in the past year with anxiety and that she was able to shop at Wal-Mart without any

problems.   Plaintiff reported moderate to severe impulse control symptoms.   Ms. Ball stated that

Plaintiff tends to get mad and say things before she thinks.   (Tr. 519)   Ms. Ball summarized that

Plaintiff experiences agitation, irritability, low self-esteem, mood swings, fatigue, and some

anxiety/pain symptoms.   Ms. Ball stated that Plaintiff had made some progress in the past year but

continued to need services.   Ms. Ball diagnosed Plaintiff with bipolar affective disorder without

melancholia; and panic disorder; and assessed a GAF score of 45.   (Tr. 530)

Plaintiff saw Vicki Adamick, NP, on February 16, 2011, with complaints of swelling in her

lower legs for about one month.   Upon examination, Ms. Adamick noted mild edema of the feet

and ankles.   Ms. Adamick diagnosed Plaintiff with mild edema, and recommended that she stop

adding salt to foods and elevate her feet when sitting.   (Tr. 681)   Plaintiff continued to complain

of edema in the ankles on a February 23, 2011 follow-up appointment with Ms. Adamick.   Ms.

Adamick noted "puffy edema" of the feet and ankles on examination.  (Tr. 671)  Ms. Adamick diagnosed Plaintiff with mild edema and again recommended that Plaintiff not use salt and elevate her feet when sitting.  (Tr. 672)

Plaintiff saw Ms. Ingram on February 18, 2011, at which time she reported experiencing "not as much depression or stress."  (Tr. 514)  Plaintiff's affect was pleasant, her concentration was adequate, and her memory was intact.  Id.  Plaintiff reported that her anxiety relating to driving had decreased significantly over the course of treatment and that she was driving almost daily with no panic attacks.  (Tr. 514)

Plaintiff saw Ms. Adamick for follow-up on March 7, 2011.  Plaintiff reported that the swelling had improved.  Upon examination, Ms. Adamick noted "very minimal puffy edema" of the ankles.  (Tr. 659)  Ms. Adamick diagnosed Plaintiff with resolved edema.  Id.

Plaintiff presented to Ms. Ingram on March 22, 2011, at which time she was angry and irritable.  Plaintiff reported that she had just attended an appointment with her daughter and was frustrated with her daughter's psychiatrist.  Plaintiff also indicated that her boyfriend's nephew was staying with them and "causing havoc."  (Tr. 692)  Plaintiff's concentration was poor and her memory was intact.  Id.  On April 1, 2011, Plaintiff reported feeling depressed and isolating herself in her room.  Plaintiff's concentration was poor.  (Tr. 690)  Plaintiff reported an improved mood on April 18, 2011.  Plaintiff's concentration was adequate.  Plaintiff indicated that she would like to do more activities in the community.  (Tr. 688)  On May 10, 2011, Plaintiff reported that her mood had been depressed.  Plaintiff indicated that her son did not call her on Mother's Day.  Plaintiff's concentration was poor, her thought process was fluid, and her memory was intact.  (Tr. 706)

The record reveals that Plaintiff met regularly with psychiatrist Shirley Eyman, M.D., for medication management.   Dr. Eyman diagnosed Plaintiff with bipolar disorder and personality disorder NOS.[22]   These records are largely illegible.   (Tr. 407, 416, 485-89, 503-05, 511-12, 546, 560, 568, 582, 590, 597, 616, 622-32, 646-49, 694)   On March 22, 2011, Plaintiff reported that she was "fine."   (Tr. 694)   On examination, Dr. Eyman noted Plaintiff's affect was "cheerful." Id.   Dr. Eyman continued Plaintiff's medications.

Dr. Eyman completed a Mental Capacity Assessment on May 19, 2011.   (Tr. 729-31)   Dr. Eyman expressed the opinion that Plaintiff was markedly limited in the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.   (Tr. 730) Dr. Eyman found that Plaintiff was moderately limited in the following abilities:   understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday without interruptions from psychologically based symptoms; complete a normal workweek without interruptions from psychologically based symptoms; perform at a consistent pace with a standard number and length of rest periods; interact appropriately with the general public; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.   (Tr. 729-30)   Finally, Dr. Eyman found that Plaintiff was only slightly limited in the following abilities:   remember locations and work-like procedures; understand and remember very short

_____

[22]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and interpersonal functioning.   Stedman's at 570.

and simple instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.   (Tr. 729-31)

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since April 30, 2010, the application date (20 CFR 416.971 *et seq*.).

2.    The claimant has the following severe impairments:   lumbar degenerative disc disease; obesity; bipolar disorder; personality disorder NOS; and panic disorder (20 CFR 416.920(c)).

3.    The claimant has the following non-severe impairment:   GERD (20 CFR 416.921).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b).   However, the claimant is limited to occasional postural maneuvers, such as balancing, stooping, kneeling crouching, crawling, and climbing.   Further, the claimant is limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few workplace changes. Additionally, the claimant is limited to occasional interaction with supervisors, coworkers, and the general public.

6.    The claimant has no past relevant work (20 CFR 416.965).

7.    The claimant was born on December 15, 1974 and was 35 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

9.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, since April 30, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 21-36)

The ALJ's final decision reads as follows:

> Based on the application for supplemental security income protectively filed on April 30, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 36)

## Discussion

### A.   Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.   See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).   The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.   See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).   Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.   See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).   If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.   See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.   See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).   "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contradictory."   Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).

The analysis required has been described as a "searching inquiry."   Id.

**B.    Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of not

less than 12 months."   42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).   The claimant has the

burden of proving that s/he has a disabling impairment.   See Ingram v. Chater, 107 F.3d 598, 601

(8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.   See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137,

141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).   First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."   If the claimant is, disability benefits must be denied.   See 20 C.F.R. §§

404.1520, 416.920 (b).   Step two requires a determination of whether the claimant suffers from a

medically severe impairment or combination of impairments.   See 20 C.F.R §§ 404.1520 (c),

416.920 (c).   To qualify as severe, the impairment must significantly limit the claimant's mental

or physical ability to do "basic work activities."   Id.   Age, education and work experience of a

claimant are not considered in making the "severity" determination.   See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   This listing is found in Appendix One to 20 C.F.R. 404.   20 C.F.R. pt. 404, subpt. P, App. 1.   If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.   See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.   See 20 C.F.R. § 404.1520 (e), 416.920 (e).   If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.   See id.   If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).   The claimant is entitled to disability benefits only if s/he is not able to perform any other work.   See id.   Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.   See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   See 20 C.F.R. §§ 404.1520a (b) (1),

19

416.920a (b) (1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).   The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:   activities of daily living, social functioning, concentration, and persistence or pace.   See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).   Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.   See id.   Next, the Commissioner must determine the severity of the impairment based on those ratings.   See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).   If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.   See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).   This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.   See id.   If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity (RFC) assessment.   See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.     Plaintiff's Claim**

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC.   Specifically, Plaintiff contends that the ALJ did not provide support for his RFC findings.

The ALJ made the following determination with regard to Plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). However, the claimant is limited to occasional postural maneuvers, such as balancing, stooping, kneeling crouching, crawling, and climbing.   Further, the claimant is limited to

simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and in general, relatively few workplace changes.   Additionally, the claimant is limited to occasional interaction with supervisors, coworkers, and the general public.

(Tr. 25)

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.   Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.   Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).   Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.   See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).   An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.   See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff challenges both the physical limitations and mental limitations found by the ALJ. With regard to the physical limitations, Plaintiff contends that the ALJ failed to cite medical evidence in support of his findings.

The ALJ found that Plaintiff's lumbar degenerative disc disease and obesity were severe impairments.   (Tr. 21)   The ALJ then found that Plaintiff had the physical RFC to perform a limited range of light work.   (Tr. 25)

In determining Plaintiff's RFC, the ALJ conducted a thorough summary of the medical

evidence.   (Tr. 26-33)   The ALJ stated that the record contains no indications from Plaintiff's treating sources that she has any work-related limitations resulting from her physical impairments. (Tr. 34)   The ALJ noted that the record reflects that Plaintiff was diagnosed with degenerative joint disease of the lumbar spine confirmed by x-rays and an MRI.   (Tr. 34, 280-81, 345)   The ALJ acknowledged that examination notes reveal Plaintiff complained of pain in her left lower extremity, and had tenderness to palpation in her back and neck.   (Tr. 34, 270, 280-81, 290, 364) The ALJ pointed out that Ms. Ingram observed that Plaintiff was able to walk with a "smooth gait" throughout the relevant time period, and there is no evidence or indication that Plaintiff required any assistive devices for ambulation.   (Tr. 34)   The ALJ noted that, although Plaintiff has complained of foot and ankle pain for which she was referred to a podiatrist, there is no record of any follow-up.   (Tr. 34, 364-66)   With regard to Plaintiff's complaints of swelling in the lower legs and feet, the ALJ stated that this swelling was mild in nature.   (Tr. 34, 659, 671-72, 680-81) In fact, on March 7, 2011, Ms. Adamich found that Plaintiff's edema had resolved.   (Tr. 659) The ALJ concluded that, based on Plaintiff's diagnoses and subjective pain complaints, Plaintiff had the RFC to perform light exertion, with no more than occasional postural maneuvers.   (Tr. 34)

The objective medical evidence cited by the ALJ, as discussed above, supports the ALJ's RFC determination.   Significantly, Plaintiff has failed to point to any evidence supporting the presence of any greater limitations.   It is the claimant's burden to prove disability and "the claimant's failure to provide medical evidence with this information should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision."   Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (emphasis in original).

Plaintiff also argues that the ALJ should have further developed the record due to the lack

22

of medical evidence in the record regarding Plaintiff's physical limitations.   It is true that the ALJ may order a consultative examination when the evidence as a whole is insufficient to reach a decision.   42 C.F.R. § 404.1519a.   In fact, the ALJ has an obligation "to develop the record fairly and fully, independent of the claimant's burden to press his case."   <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004)).   But "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant."   <u>Id.</u> Remand is appropriate only if there is some showing that the claimant "was prejudiced or treated unfairly by how the ALJ did or did not develop the record."   <u>Onstad v. Shalala</u>, 999 F.2d 1232, 1234 (8th Cir. 1993).

Plaintiff relies on <u>Nevland v. Apfel</u>, 204 F.3d 853 (8th Cir. 2000) as support for his argument that the ALJ erred in failing to develop the record.   In <u>Nevland</u>, the Court held that the ALJ failed to fully and fairly develop the record where there was "no *medical* evidence about how [the claimant's] impairments affect his ability to function now" and "the ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [the claimant's] RFC."   204 F.3d at 858 (emphasis in original). The Court found that the ALJ should have sought an opinion from the claimant's treating physicians or ordered a consultative examination.   <u>Id.</u>   Due to the lack of substantial evidence supporting the ALJ's RFC determination, the court reversed and remanded the decision of the ALJ.   <u>Id.</u>

This case is distinguishable from <u>Nevland</u>.   The claimant in <u>Nevland</u> provided medical evidence that documented his limited functional capabilities.   <u>See Nevland</u>, 204 F.3d at 854-56. The ALJ in <u>Nevland</u> erred in disregarding this evidence and Plaintiff's testimony about his RFC

solely based on the opinions of non-examining sources.   Id. at 858.

In this case, there is no medical evidence in the record supporting any greater limitations than those found by the ALJ.   Rather, the objective evidence supports the ALJ's determination that Plaintiff is capable of performing a limited range of light work.   As previously discussed, imaging of Plaintiff's back revealed only mild degenerative changes and Plaintiff's gait was consistently described as "smooth."   Plaintiff's left leg swelling ultimately resolved.   Thus, there was sufficient evidence in the record for the ALJ to determine Plaintiff's physical RFC and Plaintiff has failed to show any prejudice due to the ALJ's failure to order a consultative examination.   The ALJ's determination regarding Plaintiff's physical RFC is supported by substantial evidence in the record as a whole.

With regard to Plaintiff's mental impairments, the ALJ found that Plaintiff's bipolar disorder, personality disorder NOS, and panic disorder were severe.   (Tr. 21)   The ALJ found that Plaintiff was limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and relatively few workplace changes.   The ALJ further found that Plaintiff was limited to occasional interaction with supervisors, coworkers, and the general public.   (Tr. 25)

Plaintiff contends that, in assessing Plaintiff's mental RFC, the ALJ did not take into account Dr. Eyman's opinion that Plaintiff was markedly limited in the ability to accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.   (Tr. 730)

In support of his determination, the ALJ stated that Plaintiff's records from Pathways indicate her mental impairments were fairly well-controlled by medication, despite some variable

symptoms throughout the relevant time period.   (Tr. 34)   The ALJ stated that he found Dr. Eyman's opinion to be consistent with the medical evidence of record and afforded it significant weight.   (Tr. 33)   The ALJ noted that Dr. Eyman found that Plaintiff can generally function satisfactorily in the following areas: the ability to understand, remember, and carry out very short and simple instructions; ability to sustain an ordinary routine without special supervision; ability to make simple work related decisions; ability to ask simple questions or request assistance; ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others.   (Tr. 34, 729-31)   The ALJ stated that he was, therefore, limiting Plaintiff to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions, and relatively few workplace changes.   The ALJ further stated that, "due to the fact that Dr. Eyman opined the claimant would have moderate-to-marked limitations with social interaction, the undersigned limited the claimant to no more than occasional interaction with supervisors, coworkers, and the general public."   (Tr. 34)

Despite Plaintiff's argument to the contrary, the ALJ took into account Dr. Eyman's opinion that Plaintiff was markedly limited in some areas of social interaction.   The ALJ specifically acknowledged Dr. Eyman's findings and indicated he was assigning her opinion "significant weight."   (Tr. 33)   The ALJ summarized that Dr. Eyman found Plaintiff had "moderate to marked" limitations in the broad category of social functioning and accordingly limited Plaintiff to no more than occasional interaction with supervisors, coworkers, and the general public.   (Tr. 34)   Consequently, the ALJ did incorporate Dr. Eyman's finding regarding

Plaintiff's marked limitations in social functioning when determining Plaintiff's RFC.

Regardless, an ALJ is not required to adopt the entirety of a physician's opinion. Instead, the ALJ's determination must be based upon a review of the record as a whole. Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011). That is precisely what the ALJ did here. The ALJ indicated that he also took into account the records from Pathways, which indicate Plaintiff's mental impairments were fairly well-controlled by medication, despite some variable symptoms throughout the relevant time period. (Tr. 34) This finding is supported by the lengthy treatment notes from Plaintiff's therapist, Ms. Ingram, which reveal that Plaintiff's symptoms fluctuated, and were often exacerbated by situational stress. In fact, on March 22, 2011, just two months prior to authoring her Mental Capacity Statement, Dr. Eyman noted that Plaintiff reported that she was "fine" and that her affect was "cheerful." (Tr. 694) Thus, substantial evidence on the record as a whole supports the ALJ's mental RFC determination. While Plaintiff argues that an inconsistent position may be drawn from the evidence, the Court must affirm the ALJ's decision if it is supported by substantial evidence. Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005).

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding Plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

/s/ Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of August, 2014.